AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



United States of America

v.

STEFAN BALINT,
  aka "Papadimitriou Ioannis," and
SORIN TUFA
  aka "Miklos Kovacs Tibor,"

    Defendants

Case No.  2:23-mj-00987 -DUTY

> **FILED**
> CLERK, U.S. DISTRICT COURT
>
> March 2, 2023
>
> CENTRAL DISTRICT OF CALIFORNIA
> BY: _____ CLD ___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

    I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 1, 2023, in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(3) | Possession with 15 or More Unauthorized Access Devices |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

                           */s/ Todd Bratz*
                             *Complainant's signature*

                        Todd Bratz, USSS Special Agent
                         *Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   March 2, 2023

City and state:  Los Angeles, California

                        *Judge's signature*

                  Hon. Alka Sagar, U.S. Magistrate Judge
                          *Printed name and title*

AUSA: David C. Lachman (x5546)

**AFFIDAVIT**

I, Todd Bratz, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against Stefan Balint ("BALINT") and Sorin Tufa ("TUFA") for violations of 18 U.S.C. § 1029(a)(3) (possession of fifteen or more unauthorized access devices).

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of the United States Secret Service ("USSS"), in Los Angeles, California, as described in Attachment A:

    a.    Apple iPhone with a black case retrieved from BALINT's person ("SUBJECT DEVICE 1"); and

    b.    A black Apple iPhone with a clear case retrieved from TUFA's person ("SUBJECT DEVICE 2," and collectively with SUBJECT DEVICE 1, the "SUBJECT DEVICES").

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1029 (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am Supervisory Special Agent with the United States Secret Service ("USSS") and have been so employed since September 20, 2004.  As a Special Agent with the USSS, I am a "federal law enforcement officer" empowered under the authority of 18 United States Code Section 3056.  I graduated from the Federal Law Enforcement Training Center in Glynco, Georgia and the U.S. Secret Service Special Agent Training Course in Beltsville, Maryland.  I have also attended numerous trainings and briefings throughout my career on the conduct of criminal investigations involving financial crimes.

6.    My criminal investigative responsibilities include the investigation of financial fraud and other related offenses.  As a Special Agent, I have received training on how people use access devices to commit financial crimes and understand the law enforcement techniques that can be utilized to investigate and disrupt such activity.  In the course of my investigations and

other cases on which I have worked, I have gained experience executing warrants on physical premises, conducting physical surveillance, reviewing evidence including financial records, and interviewing victims, witnesses, and suspects.

### III. SUMMARY OF PROBABLE CAUSE

7.    Between August 2022 and January 2023, the California Department of Social Services ("DSS") has detected more than $38.9 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards.  Much of this fraud is from two specific programs known as CalFresh and CalWORKs, which help low-income households pay for housing, food, and other necessary expenses. Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

8.    For example, between on or about January 1, 2023, and on or about January 5, 2023, more than approximately $117,000 was withdrawn from ATMs at a single financial institution branch located in Toluca Lake, California in Los Angeles County.  The unauthorized withdrawals conducted during these five days and at this single bank branch affected approximately 152 victim EBT cardholders.  The dates of these withdrawals coincided with the disbursement by DSS of CalFresh and CalWORKs benefits to EBT cardholders.

9.    Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue.  During the unauthorized ATM withdrawals, suspects can often be seen holding

stacks of cards and conducting withdrawals from multiple accounts in quick succession at one ATM.

10.   On or about March 1, 2023, beginning at approximately 4:30 a.m., law enforcement conducted physical surveillance at a Citibank ATM terminal located at 7119 Topanga Canyon Boulevard, Canoga Park, California, which was identified by DSS as one of the top ATM locations for EBT fraud.

11.   During the course of that surveillance, law enforcement agents observed BALINT arrive at the Citibank ATM in Canoga Park and proceed to the ATM terminal at approximately 8:45 a.m.  At the ATM terminal, law enforcement agents observed, and Citibank confirmed, that BALINT conducted approximately ten balance inquiries using EBT cards belonging to individuals other than BALINT.

12.   After BALINT conducted balance inquiries at the Citibank ATM in Canoga Park, law enforcement observed BALINT meet TUFA in the bank parking lot and exchange items with TUFA. TUFA placed those items into his pocket and proceeded to the Bank of America ATM terminal located at 22004 Sherman Way, in Canoga Park, California.

13.   Law enforcement agents arrested BALINT, who was found to possess approximately 13 cloned access devices on his person. A search of BALINT's vehicle revealed at least an additional 20 cloned access devices cards belonging to individuals other than BALINT.  SUBJECT DEVICE 1 was seized from BALINT upon arrest.

14.   Law enforcement agents also arrested TUFA, who was found to possess approximately four cloned access devices on his

person.  BALINT had used two of the four cloned access devices found on TUFA's person just minutes prior to TUFA's arrest to conduct balance inquiries at the Citibank ATM in Canoga Park. SUBJECT DEVICE 2 was seized from TUFA upon arrest.  In total, BALINT and TUFA collectively possessed at least approximately 37 cloned access devices.

### IV. STATEMENT OF PROBABLE CAUSE

15.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Regulatory Background of CalFresh and CalWORKs Programs**

16.  DSS is a government agency that administers several benefit and assistance programs for residents of the state of California.  One of the assistance programs administered by DSS is called CalFresh (formerly known as food stamps), which helps low-income households purchase food and household items to meet their nutritional needs.  Another assistance program administered by DSS is called CalWORKs, which helps low-income families with children pay for housing, food, and other necessary expenses.

17.  Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits at www.getcalfresh.org and www.benefitscal.com.  Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

18.   CalFresh and CalWORKs benefits are issued through Electronic Benefit Transfer cards ("EBT cards").  EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions. For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

19.   The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

20.   Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each month.  Those benefits are deposited directly from DSS into the account of the EBT cardholder.

21.   The EBT cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal identification number ("PIN") established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by DSS intended for beneficiaries of the CalFresh or CalWORKs programs.

**B.    Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

22.   Since in or about August 2022, local law enforcement has been working with DSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards.  Based on analysis of victim complaints to DSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

23.   A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the DSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

24.   On a legitimate debit or credit card, the information coded on the card's magnetic stripe will match the information embossed on the front of the card.  This information includes the account number, expiration date, and cardholder's name, among other information.  Whereas on a cloned card, the information coded on the magnetic stripe will not match the information embossed on the front of the card.  For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic

card with a magnetic stripe, the magnetic stripe will be coded with the EBT card information, but the card itself will still bear the information of the gift card or bear no information if it is a blank white plastic card.

25. Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

26. The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals. For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number. Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

27. As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim accountholder's account information that was obtained from skimming. Once that information is loaded onto another fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw

cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

28.   In or about September 2022, local law enforcement conducted a surveillance and arrest operation in the Los Angeles, California area.  This operation was planned in response to the large number of unauthorized withdrawals occurring at ATMs in the Los Angeles area during a short period of time.  Specifically, law enforcement had analyzed fraudulent EBT withdrawal data and noticed a high volume of unauthorized withdrawals on specific dates and times that coincided with the dates when the majority of benefits are disbursed to EBT cardholders.

29.   As a result of this operation, local law enforcement officers established surveillance at select ATMs that were used to conduct a significant volume of EBT fraud.  Law enforcement officers surveilled those ATMs around the dates when benefits had been disbursed, observed suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession, and arrested multiple individuals believed to be making fraudulent withdrawals of EBT benefits.  As a result, law enforcement officers arrested approximately 16 suspects.  All of the arrested suspects were later determined to be citizens of countries other than the United States who did not have documentation to be lawfully present in the United States.  All of the individuals arrested were released from local custody within hours of their arrest and absconded from any future judicial proceedings.

30.  In or about February 2023, in response to a further increase in unauthorized cash withdrawals utilizing EBT cards after the local law enforcement September 2022 operation, federal law enforcement agents conducted a similar surveillance and arrest operation in the Los Angeles, California area.  Law enforcement agents established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs.  Law enforcement arrested three suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession.  Two of those defendants came to the ATM together, possessed 35 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that they had made more than $190,000 in past attempted fraudulent EBT withdrawals from a single bank since October 2022.  One additional defendant possessed 269 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that the defendant had made more than $70,000 in past attempted fraudulent EBT withdrawals from a single bank since January 2023.  All three of these defendants were determined to be citizens of Romania and did not have documentation to be lawfully present in the United States.  The three arrested defendants were ordered detained pending trial by the Hon. Karen Stevenson and Hon. Margo A. Rocconi.  A federal grand jury returned two indictments against the three defendants for bank fraud, in violation of 18 U.S.C. § 1344; aggravated identity theft, in violation of 18 U.S.C. § 1028A; use of unauthorized access devices, in violation 18 U.S.C. §

1029(a)(2); and possession of unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-CR-0077-JFW.

   C.   **Background of Current Operation to Combat EBT Fraud**

   31.   Data provided by DSS, based in part upon reported fraud by victims, reported fraud to local law enforcement, bank records, and surveillance indicates that as of in or about January 2023, there has been approximately $71.3 million in stolen funds from victim EBT cards.

   32.   For the previous six months, between in or about August 2022 and in or about January 2023, in the Central District of California and elsewhere, more than approximately $38.9 million has been stolen from victim EBT cards.  The majority of these funds were stolen through unauthorized ATM withdrawals.

   33.   Between on or about January 1, 2023, and on or about January 5, 2023, more than approximately $7.2 million was stolen from victim EBT cards largely through unauthorized ATM withdrawals.  Of the approximately $7.2 million stolen from victim EBT cards in the beginning of January 2023, more than approximately $2.9 million was stolen, almost entirely through unauthorized ATM withdrawals, in Los Angeles County alone.

   34.   For example, between on or about January 1, 2023, and on or about January 5, 2023, more than approximately $117,000 was withdrawn from ATMs at a single financial institution branch located in Toluca Lake, California in Los Angeles County.  The unauthorized withdrawals conducted during these five days and at

this single bank branch affected approximately 152 victim EBT cardholders.  The dates of these withdrawals coincided with the disbursement by DSS of EBT benefits, including CalFresh and CalWORKs.

35.  Based upon my training and experience conducting access device fraud investigations, I know that suspects committing access device fraud schemes will often target particular BINs when harvesting stolen card information collected from skimming devices.  Thus, suspects using skimming may target the BIN associated with DSS, in essence, targeting CalFresh and CalWORKs benefits.  Moreover, based upon my training and experience, the sheer volume of unauthorized ATM withdrawals occurring during the early days of the month is further indicative that suspects participating in the fraud scheme at issue are targeting EBT cards because benefits are typically disbursed to EBT cardholders during the early days of each month.

36.  Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue.  During the unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals in quick succession at one ATM.  Based upon my training and experience, I know that suspects perpetrating access device fraud schemes will often conduct unauthorized withdrawals using cloned cards in rapid succession at ATMs.

37.  Based upon the rapid succession of unauthorized ATM
withdrawals being conducted, the fact that the cards being used
to conduct the unauthorized cash withdrawals are nearly all
cloned EBT cards, and the fact that nearly all of the
unauthorized withdrawals are happening during the early days of
the month, I believe that suspects participating in the fraud
scheme at issue are ostensibly targeting EBT cards.

**D.    BALINT and TUFA Possessed Unauthorized Access Devices
       on March 1, 2023**

38.  Based upon the large dollar amount being stolen from
victim EBT cards, the number of victims impacted, the
concentration of unauthorized ATM withdrawals occurring in
particular areas, and the large number of unauthorized ATM
withdrawals occurring at singular bank locations, law
enforcement agents conducted a surveillance and arrest operation
in March 2023.

39.  On or about March 1, 2023, law enforcement was
conducting physical surveillance at various bank and ATM
locations throughout Los Angeles County, including a Citibank
ATM terminal located at 7119 Topanga Canyon Boulevard, Canoga
Park, California (the "Canoga Park ATM"), which was identified
as one of the top ATM locations in Los Angeles for EBT fraud.
Based on DSS fraud data, surveillance was conducted beginning at
approximately 4:30 a.m.

40.  During this surveillance, law enforcement observed an
unknown individual, later identified as BALINT, approach the
Canoga Park ATM at approximately 8:45 a.m.  At the Canoga Park

ATM, law enforcement observed BALINT appear to conduct multiple transactions with multiple cards in rapid succession for approximately 5 minutes.  Law enforcement also observed BALINT write on each card after each the transaction.  BALINT did not appear to retrieve cash at the conclusion of each transaction.  These transactions were later confirmed by Citibank to be balance inquiries.

41.  Citibank ATM surveillance photographs obtained by law enforcement depict BALINT at the Canoga Park ATM conducting approximately ten unauthorized transactions using cloned EBT cards, which corroborates law enforcement agents' surveillance observations.  Two of the cards that BALINT used to conduct balance inquiries at the Canoga Park ATM were later discovered on TUFA's person after arrest.

42.  Based upon my training and experience, individuals conducting legitimate transactions at ATMs typically conduct a single transaction and do not transition between multiple payment cards rapidly to conduct several transactions in a short period of time.  Additionally, I know based on my participation in the investigation of the fraud scheme at issue that suspects will often conduct balance inquiries of cloned EBT cards in order to learn the balance on the cards prior to conducting illicit ATM withdrawals.

43.  One of the cards used by BALINT to conduct balance inquires at the Canoga Park ATM was later confirmed to be an EBT card belonging to A.K. of Los Angeles, California.  This same

card was discovered on TUFA's person when law enforcement arrested TUFA.

44.   After BALINT conducted the balance inquiries at the Canoga Park ATM, law enforcement observed BALINT walk through the bank parking lot and meet with TUFA.  BALINT appeared to hand items to TUFA.  TUFA then placed these unknown items in TUFA's jacket pocket.  Law enforcement then observed TUFA walk towards the Bank of America ATM located at 22004 Sherman Way, Canoga Park, California.

45.   Based on the date, time, ATM location, presence of multiple, and successive ATM transactions on multiple EBT cardholder accounts during a short time period, law enforcement detained BALINT and TUFA in order to investigate further.

46.   BALINT had approximately 13 cloned access devices and approximately $819 in cash on his person.  TUFA had approximately four cloned access devices and approximately $453 in cash on his person.  The cloned cards consisted of a variety of re-encoded prepaid cards and gift cards.  The cards also had stickers placed on them with what appeared to be, based on my training and experience, card balances and victim PINs.

47.   Law enforcement confirmed these were cloned EBT cards that belonged to other individuals, not BALINT or TUFA. Moreover, the cloned cards were affixed with stickers bearing victim PIN numbers that corresponded to each cloned card and that were needed to conduct the unauthorized ATM withdrawals.

48.   SUBJECT DEVICE 1 was found on BALINT's person.

49.   SUBJECT DEVICE 2 was found on TUFA's person.

50.   Law enforcement later seized from BALINT's person a vehicle key fob belonging to a white BMW sedan bearing California license plate 9EIP526, which was parked in the immediate vicinity of the Canoga Park ATM.  A query of the license plate database by law enforcement later determined that the vehicle was a loaner vehicle from a local BMW dealership.  A search of BALINT's BMW sedan revealed that BALINT possessed approximately $26,480 in cash and at least 20 additional cloned access devices in the BMW sedan.

51.   When asked to identify himself, BALINT provided the name "Papadimitriou Ioannis" and produced a false identification card from Greece bearing that name and a date of birth of June 17, 1981.  This identification was later confirmed to be fictitious based on the positive identification of BALINT by Romanian law enforcement officials.

52.   When asked to identify himself, TUFA provided the name "Miklos Kovacs Tibor" and produced a false identification card from Hungary bearing that name and a date of birth of December 17, 1974.  This identification was later confirmed to be fictitious based on the positive identification of TUFA by Romanian law enforcement officials.

53.   Based on my training and experience, I know that individuals conducting access device fraud schemes will often conceal their true identities by obtaining fictitious IDs to enter the country illegally while evading detection by law enforcement.

54.  ICE confirmed that defendants are not lawfully present in the United States.

55.  Based on my review of law enforcement database records and information received from Romanian law enforcement officials, BALINT has a criminal history in the United States dating back to 2019 for various credit card fraud and identity theft related crimes.  According to law enforcement database queries, BALINT currently has seven outstanding warrants for charges including illegal use of credit cards, aggravated identity theft, and failure to appear.  BALINT also has a criminal history in other countries including a 2013 arrest for theft in Romania, for which he received a six-month sentence, a 2013 arrest for fraud in Germany, for which he received a 26-month sentence, a 2016 arrest for theft in Sweden, for which he received a ten-month sentence, a 2016 arrest for aggravated theft in Italy, for which he received with a two-year sentence, and a 2018 arrest for theft in the United Kingdom.

56.  Based on my review of law enforcement database records and information received from Romanian law enforcement officials, TUFA has a criminal history in other countries, including a 2009 arrest for card fraud in Romania, for which he received a ten-year sentence, a 2018 arrest for theft in the Germany with a two-year sentence, and a 2019 arrest for theft in the United Kingdom, for which he received a four- month sentence.

57.  BALINT and TUFA were arrested, read their Miranda rights, and chose not to speak with law enforcement.

17

## V.  <u>TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES</u>

58.  Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.  It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.  Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items retrieved from stolen mail or mail matter, with their cellphones.

c.   It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

d.   It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units.  Software relevant to such schemes can also often be found on digital devices, such as computers.

e.   Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their

digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos. Suspects may also have paper copies of such records, which they may keep on their person or in their cars, homes, or storage units.

f.   Individuals engaged in mail and identity theft often use multiple digital devices, which they may keep on their person or in their cars or homes.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

59.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary

_____

[1] As used herein, the term "digital device" includes the SUBJECT DEVICES as well as any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

60.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

61.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BALINT or TUFA's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of BALINT or TUFA's faces with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

62. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

63. For all of the reasons described above, there is probable cause to believe that BALINT and TUFA have committed a violation of 18 U.S.C. § 1029(a)(3) (possession of fifteen or more unauthorized access devices).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>2nd</u> day of
March, 2023.

THE HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE